**IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | | |
|---|---|---|
| **PETER ACCURSO,** | : | |
| *Plaintiff & Counterclaim Defendant,* | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **INFRA-RED SERVICES, INC., et al.,** | : | **No. 13-7509** |
| *Defendants & Counterclaim Plaintiffs.* | : | |

**M E M O R A N D U M**

PRATTER, J.                                                                                      AUGUST 10, 2015

Peter Accurso claims his prior employers, Brian Land, Audrey Strein, and their three roofing companies, submitted him to unlawful lie detector tests prior to wrongfully terminating his employment. Beyond the fact that Mr. Accurso's working relationship with these Defendants ended in January 2012, virtually everything remains in dispute.

Mr. Accurso argues that the termination was a result of the two unlawful polygraph examinations and breached his employment contract. The Defendants insist that they were within their rights to fire Mr. Accurso, who had been surreptitiously diverting business to their competitors. Mr. Accurso seeks relief for violations of the Employee Polygraph Protection Act ("EPPA"), breach of contract, intentional interference with contract, violations of the Pennsylvania Wage Payment and Collection Law, and civil conspiracy. Defendants counterclaim against Mr. Accurso for breach of contract, breach of fiduciary duty, usurpation of corporate opportunity, fraud, intentional interference with prospective contractual relations, and misappropriation of trade secrets. They seek summary judgment on Mr. Accurso's claims. For the reasons explained below, the Court will grant that motion in part and deny it in part.

## I.      BACKGROUND

This case involves roofing companies founded by, or otherwise connected to, Brian Land. The first, Infra-Red Services, Inc., was founded in 1992 and operated until the early to mid-2000s. The second, Roofing Dynamics, Inc., was founded in 2006. Mr. Land served as the president of Roofing Dynamics, Inc. The third, Roofing Dynamics Group, LLC, was founded in 2011. Mr. Land's role in Roofing Dynamics Group during the relevant time period is disputed. Defendants claim he was "a principal member of Roofing Dynamics Group," but Mr. Accurso, despite alleging in his Second Amended Complaint that Mr. Land was a principal member of Roofing Dynamics Group, LLC, *see* Second Am. Compl. ¶ 10 (Doc. No. 36), now claims that Mr. Land had no official relationship with Roofing Dynamics Group, citing deposition testimony from Mr. Land and Ms. Strein. All agree that Ms. Strein was the President of Roofing Dynamics Group.

Mr. Accurso signed an agreement in September 2004 with Infra-Red Services, Inc. It is disputed whether the agreement amounted to an "independent contractor agreement," (as it was so titled), or an employment contract. The agreement provided that Mr. Accurso would market and sell Infra-Red's roofing services within a set "territory" (defined by telephone area codes), for which he would receive 50% of all commissions or income from leads he generated within his territory. The agreement had a term of four years, to be automatically renewed every two years thereafter, "until canceled by either party upon written notice to the other party." Mot. for Summ. J. Ex. C. 3. "Such notice" was to be "given not less than ninety (90) days prior to the end of any term hereunder." *Id.* The meaning of this termination provision is disputed by the parties.

The Agreement allowed for unilateral partial or full assignment of the Agreement by Infra-Red Services. Infra-Red assigned its rights and obligations under the agreement to Roofing

Dynamics, Inc. in the mid-2000s. In August 2011, Roofing Dynamics, Inc., assigned its rights and obligations under the Agreement to Roofing Dynamics Group, LLC.

On January 4, 2012, Defendants' legal counsel, Richard Berlinger, provided Mr. Accurso with a "Notice of Immediate Termination." The Notice gave various reasons for the termination of the Agreement, including Mr. Accurso's diversion of business opportunities, interference with contractual relations, and an instance in which Mr. Accurso gave less than 24 hours' notice before taking a week vacation in December 2011. The Notice also detailed the amount Mr. Accurso would be paid for his prior services, and it directed Mr. Accurso to take or refrain from taking a number of actions, including returning all trade secrets and refraining from contacting certain customers.

While employed by Defendants, Mr. Accurso took two polygraph examinations: one at Mr. Land's behest in March 2008, because Mr. Land suspected Mr. Accurso of diverting business opportunities away from Roofing Dynamics, Inc., and a second in 2010. The parties dispute the circumstances leading up to, and the consequences of, these polygraph examinations. Defendants argue that the 2010 polygraph examination was mutually agreed to, but Mr. Accurso argues that Mr. Land insisted that he (Mr. Accurso) submit to a second polygraph. Defendants argue that Mr. Accurso suffered no adverse employment consequences as a result of the two polygraphs. Mr. Accurso disputes this and claims that he was fired because of the polygraph results. Mr. Accurso also asserts that he was fired because Mr. Land wanted to divert Mr. Accurso's business to his significant other, Ms. Strein.

Mr. Accurso brought seven claims against Defendants, two of which have been dismissed: (1) violation of the Employee Polygraph Protection Act; (2) breach of contract; (3) intentional interference with contractual relations; (4) violation of the Pennsylvania Wage

Payment and Collection Law; (5) unjust enrichment (dismissed per Dec. 3, 2014 Order (Doc. No. 64)); (6) intentional infliction of emotional distress (dismissed per Dec. 3, 2014 Order); and (7) civil conspiracy. The Court also dismissed Mr. Accurso's Employee Polygraph Protection Act claim to the extent it was based on the allegation that Defendants required Mr. Accurso to submit to a 2008 polygraph examination, as this claim is time-barred. *See* Dec. 3, 2014 Order. Claims based on adverse employment action taken against Mr. Accurso as a result of the 2008 polygraph examination were not deemed time-barred.

## II.    ANALYSIS

Defendants move for summary judgment on Mr. Accurso's five remaining claims. If successful, this would leave only the counterclaims for resolution.

Summary judgment is appropriate only when "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A fact is "material" if it could affect the outcome of the suit, given the applicable substantive law. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute about a material fact is "genuine" if the evidence presented "is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* When the party seeking summary judgment does not bear the burden of persuasion at trial, the moving party may meet its burden at summary judgment by showing that the nonmoving party lacks sufficient evidence to create a genuine dispute as to any material fact. *Celotex Corp. v. Catrett*, 477 U.S. 317, 323-24 (1986). In evaluating a summary judgment motion, a court "must view the facts in the light most favorable to the non-moving party," and make every reasonable inference in that party's favor. *Hugh v. Butler Cnty. Family YMCA*, 418 F.3d 265, 267 (3d Cir. 2005). The court must not weigh the evidence or make credibility determinations. *Boyle v. County of Allegheny*, 139 F.3d 386, 393 (3d Cir. 1998). Nevertheless,

the party opposing summary judgment must support each essential element of his or her opposition with concrete evidence in the record. *Celotex*, 477 U.S. at 322-23. "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." *Anderson*, 477 U.S. at 249-50 (citations omitted).

### a. Employee Polygraph Protection Act Claims

The Employee Polygraph Protection Act states that "it shall be unlawful for any employer . . . (1) directly or indirectly, to require, request, suggest, or cause any employee or prospective employee to take or submit to any lie detector test; (2) to use, accept, refer to, or inquire concerning the results of any lie detector test of any employee or prospective employee" or to otherwise take an adverse employment action against an employee on the basis of the results of any lie detector test. 29 U.S.C. § 2002. Mr. Accurso alleges that he was an employee within the meaning of the EPPA (a point the Defendants do not challenge), and that Mr. Land and Ms. Strein, on behalf of Infra-Red and Roofing Dynamics, Inc., unlawfully insisted that Mr. Accurso submit to the 2008 and 2010 polygraph examinations. Mr. Accurso also alleges that Defendants unlawfully used the results of the polygraph to terminate Mr. Accurso's employment.

Defendants argue that Mr. Accurso's EPPA claims fail for two reasons: (1) Mr. Accurso has adduced no evidence that Defendants "insisted" that he take the 2010 polygraph; (2) Mr. Accurso has not adduced competent, admissible evidence that he suffered adverse employment consequences based upon the result of any polygraph examination.

*1. Circumstances and Fact of 2010 Polygraph[1]*

Defendants focus upon whether there is evidence that Mr. Land "insisted" that Mr. Accurso submit to the 2010 polygraph. But their focus overlooks that a violation of the EPPA does not require that an employer "insist" upon a polygraph exam. Rather, an EPPA violation will lie where "any employer . . . (1) directly or indirectly, [requires], request[s], suggest[s], or cause[s] any employee or prospective employee to take or submit to any lie detector test." 29 U.S.C. § 2002. There is sufficient evidence in the record that Mr. Land "requested, suggested, or caused" Mr. Accurso to submit to a lie detector test. Indeed, Mr. Land testified himself at his deposition that "[i]t's incidents like that . . . that led us to insist [Mr. Accurso] take the polygraph test." Resp. in Opp. to Mot. for Summ. J. Ex. F 50:3-5 (Doc. No. 69-8) (hereinafter "Aug. 8, 2013 Dep. of Brian Land"). Mr. Accurso also points to multiple letters from Mr. Land to Mr. Accurso in which Mr. Land appears to request, at least, that Mr. Accurso submit to the 2010 polygraph. For example, in an April 2009 letter from Mr. Land to Mr. Accurso titled "Tentative Partnership Agreement/Polygraph Requirement," Mr. Land wrote:

> When we took the polygraph over a year ago, we agreed to keep things 'together' for a while [*sic*] . . . pending another polygraph down the road. I was pretty shook up over your failure to pass the first polygraph . . . I'm sure you will pass the second one! Let's do the polygraph in the June/July timeframe. When you pass, we can then think about conjuring up a partnership agreement . . . . Again we made this 'second chance' on moving forward contingent on your passing the second polygraph . . . .

Resp. in Opp. to Mot. for Summ. J. Ex. G 16-17 (Doc. No. 69-9). Another letter from Mr. Land to Mr. Accurso reads, "If, however, you lie here and now in you [*sic*] responses . . . and those lies are confirmed by polygraph we will part company. If you refuse to respond positively to all

---

[1] The circumstances giving rise to the 2008 polygraph are not at issue because even if Defendants required Mr. Accurso to submit to it, a claim based on that fact *alone* would be time-barred. The consequences of the 2008 polygraph, however, are not time-barred.

this, I'm afraid that I can only interpret that kind of response as a confirmation of my suspicions." *Id.* at 36. [2] Mr. Accurso also offers his own testimony that Mr. Land insisted on the 2010 polygraph, Resp. in Opp. to Mot. for Summ. J. Ex. A-1 ¶ 27 (Doc. No. 69-2) (hereinafter "Affidavit of Peter Accurso").[3] There is a factual dispute, therefore, as to whether Defendants violated the EPPA by requiring, requesting, suggesting, or causing Mr. Accurso to submit to the 2010 polygraph.

### 2. Consequences from the 2008 and 2010 Polygraphs

Defendants next argue that Mr. Accurso suffered no adverse consequences as a result of the polygraph exams. Defendants note that Mr. Accurso testified at his deposition that, following the polygraph examinations, he continued working for Mr. Land as before. Defendants argue that this testimony reveals the absence of a causal link between the polygraph examinations and Mr. Accurso's termination. However, according to Mr. Accurso, his testimony referred only to the fact that he was not fired in the immediate aftermath of the 2008 and 2010 polygraphs—his ultimate termination in 2012 was, according to Mr. Accurso, based primarily on the results of the polygraph examinations.

Mr. Accurso points to sufficient evidence in the record to support this claim. Mr. Land, when asked at his deposition whether the polygraph examinations were "primary motivating factors" in the decision to terminate Mr. Accurso, responded, not without vague ambiguity, that Mr. Accurso's "concession after the first polygraph was very instructive to us as to what [Mr. Accurso] had done." Aug. 5, 2014 Dep. of Brian Land 11:9-11. Further, there is evidence that

---

[2] The Court observes that such communications hardly bode well for an amicable business relationship regardless of the test outcome. It would seem to any outside observer that the relationship was doomed, at least in terms of amiability.

[3] Ms. Strein is also implicated: Mr. Land testified that Ms. Strein actually found the polygrapher. *See* Resp. in Opp. to Mot. for Summ. J. Ex. E (Doc. No. 69-7) (hereinafter "Aug. 5, 2014 Dep. of Brian Land") 32:20-24.

Mr. Accurso failed the 2008 polygraph exam, *see id.* 35:8-9, and perhaps the 2010 one, *see id.* 40:10-13; 43:14-19 (testifying that the polygrapher characterized Mr. Accurso as being too "vague" in his responses), and that Mr. Accurso was fired for conduct that he had been asked about during these polygraph examinations (namely, diversion of business). On top of all this, there are the letters from Mr. Land threatening Mr. Accurso with termination if his "lies are confirmed by polygraph" Resp. in Opp. to Mot. for Summ. J. Ex. G 36. Mr. Land then testified at his deposition that the polygraph results "absolutely confirmed" his suspicions about Mr. Accurso. Aug. 5, 2014 Dep. of Brian Land 41:15. This evidence is sufficient for a jury to reasonably infer that the polygraph results were used in taking adverse employment action against Mr. Accurso.

### b. Breach of Contract

The debate about Mr. Accurso's breach of contract claim centers around the paragraph nine of the "Independent Contractor Agreement" which reads in full:

> **Term.** This Agreement is effective as of the date first above written and shall continue in effect for a term of four (4) years. Thereafter, this Agreement shall automatically renew for successive two (2) year terms until canceled by either party upon written notice to the other party. Such notice shall be given not less than ninety (90) days prior to the end of any term hereunder. It is the intent of both Company and Contractor to enter into a full 50/50 partnership at the end of the four (4) year term of this contract. The term of this contract can be accelerated according to Schedule D included herein.

Mot. for Summ. J. Ex. C. 3.

The dispute between the parties is whether Defendants breached the contract by firing Mr. Accurso immediately, rather than at the end of the term. Defendants assert that the contract allowed for immediate cancelation upon written notice, provided that the written notice was not given less than 90 days prior to the end of the term. Therefore, Defendants argue, Mr. Accurso's immediate termination prior to the end of the two-year term was not a breach of the contract, as

the notice of his termination was not made within the 90 days prior to the end of the two-year term. Mr. Accurso argues that the cancelation provision of the contract provides that the contract could be canceled *only* at the end of a two-year term, and that, to do so, written notice had to be given more than 90 days before the end of that two-year term.

When interpreting a contract, the Court first considers the intent of the parties as expressed by the words used in the contract. *Atkinson v. LaFayette Coll.*, 460 F.3d 447, 452 (3d Cir. 2006). If those words used in the contract are unambiguous, then, as a matter of law, those words control. *Bohler–Uddeholm Am., Inc. v. Ellwood Grp., Inc.*, 247 F.3d 79, 92–93 (3d Cir. 2001). The court considers individual terms in the context of their entire contractual provision when determining the intent of the parties. *NorFab Corp. v. Travelers Indem. Co.*, 555 F. Supp. 2d 505, 509 (E.D. Pa. 2008)

Here, the Court rejects Defendants' interpretation of the written contract—*i.e.*, that the contract allows for *immediate* termination of the contract for any reason whatsoever, so long as the written notice of termination is not given less than 90 days before the end of a two-year term. While the document certainly could have expressly provided for immediate termination without cause (with or without notice), it did not do so. Defendants' interpretation of the contract provision would essentially nullify the provision in the contract setting out two-year terms. *County of Dauphin v. Fid. & Deposit Co. of Md.*, 770 F. Supp. 248, 254 (M.D. Pa. 1991) ("[P]roper contract interpretation requires the court to read the contract documents as an entirety and to avoid giving an interpretation to a provision that will nullify the clear and unambiguous language of another provision.").

If the contract could be immediately canceled upon written notice, but would otherwise renew every two years, why specify the length of the contract? If Defendants' interpretation of

the agreement were correct, a rational drafter would have simply characterized the contract as ongoing until canceled upon written notice of either party.[4] Perhaps Mr. Accurso's contract specified the length of the term so as to provide a 90-day moratorium every two years during which the contract could not be canceled. But Defendants have not explained any rational reason why a contract would allow for immediate termination at any time *except* for a 90-day period every two years, nor can the Court conceive of one.

The better interpretation of the contract is the one offered by Mr. Accurso. Mr. Accurso's interpretation more closely reconciles the contract's provisions with rationality: the contract provides for two-year terms which automatically renew, and should either party wish that the terms not renew, the canceling party must provide written notice more than 90 days before the end of the term; the automatic renewal of the contract would then be canceled and the contract would expire *at the end* of the two-year term. This interpretation is correct because the termination provision, when read in the context of a sentence setting out automatically renewing terms, refers to the cancelation of the automatic renewal of the contract. Moreover, Mr. Accurso's interpretation gives effect to all provisions in the contract, including those specifying the length of the terms. Because Mr. Accurso has adduced evidence that his employment was terminated before the end of the two-year term, his breach of contract claim will survive summary judgment.

### c.  Intentional Interference with Contractual Relations

Mr. Accurso brings a somewhat amorphous intentional interference with contractual relations claim. "To establish an intentional interference with contractual relations under

---

[4] After all, the drafters of the Constitution, when providing federal judges with lifetime appointments, wrote that the judges would "hold their offices during good behaviour," not that they would "hold their offices for automatically renewing two-year terms during good behaviour." *See* U.S. Const. art. III, § 1.

Pennsylvania law, a plaintiff must demonstrate four elements: (1) a contractual or prospective

contractual relationship between the plaintiff and a third party; (2) purposeful action by the

defendant, intended to harm the relationship or to prevent a prospective relationship; (3) the

absence of privilege or justification for the defendant's actions; and (4) actual legal damage as a

result of the defendant's conduct." *Kovach v. Serv. Pers. & Employees of the Dairy Indus., Local

Union No. 205*, No. 2:12-00432, 2014 WL 4924912, at \*14 (W.D. Pa. Sept. 30, 2014).

Pennsylvania law requires the alleged tortfeasor to have acted improperly in interfering

with the contract. *See Crivelli v. Gen. Motors Corp.*, 215 F.3d 386, 394 (3d Cir. 2000). The

Restatement (Second) of Torts § 767, which has been adopted by Pennsylvania, "sets forth the

following factors to consider when determining whether the interference is improper: (a) the

nature of the actor's conduct, (b) the actor's motive, (c) the interests of the other with which the

actor's conduct interferes, (d) the interests sought to be advanced by the actor, (e) the social

interests in protecting the freedom of action of the actor and the contractual interests of the other,

(f) the proximity or remoteness of the actor's conduct to the interference and (g) the relations

between the parties." *Id.* at 394-95 (citing Restatement (Second) of Torts § 767).

The Court characterizes Mr. Accurso's claim as "amorphous" because it is unclear who

interfered with which contract and how. The first element of tortious interference with

contractual relations is the existence of a contractual or prospective contractual relationship

between the plaintiff and *a third party*. There is evidence that Mr. Accurso had contractual

relations with both Roofing Dynamics Group, LLC, and Roofing Dynamics, Inc., as the contract

between Mr. Accurso and Infra-Red was assigned to Roofing Dynamics, Inc., and then assigned

again, at least partially, to Roofing Dynamics Group. *See* Resp. in Opp. to Mot. for Summ. J. Ex.

D 64:19-67:24 (Doc. No. 69-6) (hereinafter "Dep. of Audrey Strein") (discussing how both

entities operated simultaneously, with Roofing Dynamics, Inc., handling legacy accounts, and

Roofing Dynamics Group, LLC, handling new business). That leaves the question of whether

these contracts are between Mr. Accurso and *a third party—i.e.*, whether Mr. Accurso has

adduced sufficient evidence that a party outside the contractual relationship induced a

contracting party to breach those contractual relations. Mr. Accurso appears to only assert claims

for tortious interference with contract against Mr. Land and Ms. Strein. *See* Mem. in Opp. to

Mot. for Summ. J. 35 (Doc. No. 69-1). Essential to such a claim is establishing that either (a) Mr.

Land interfered with a contract to which neither he, nor an entity for which he was acting as an

agent, was a party; or (b) Ms. Strein interfered with a contract to which neither she, nor an entity

for which she was acting as an agent, was a party. *See Malik v. Quest Diagnostics, Inc.*, No. 05-

0085, 2006 WL 39147, at *6 (W.D. Pa. Jan. 6, 2006) ("Because a corporation can act only

through its agents, where the defendant is acting as an agent of the corporation within the scope

of his employment, there is no third party against whom an action for intentional interference

with a contractual relationship can lie."). Moreover, "in order to make out a claim of tortious

interference with contractual relations, a plaintiff must show the absence of privilege or

justification on the part of the defendant. The actions of a principal's agent are afforded a

qualified privilege from liability for tortious interference with the principal's contract." *CGB

Occupational Therapy, Inc. v. RHA Health Servs. Inc.*, 357 F.3d 375, 385 (3d Cir. 2004)

(quotation marks and citations omitted).

> Mr. Accurso articulates his theory as follows:

> Specifically, it is contended that Defendant Strein (who had no official position
> with respect to Roofing Dynamics, Inc.) conspired with Defendant Land to form
> Roofing Dynamics Group, LLC, for the purpose of interfering with Plaintiff
> Accurso's contractual relations with Roofing Dynamics, Inc.—a contractual
> relationship which Plaintiff had with someone other than Defendant Strein. It is
> further contended that Defendant Land, acting outside the scope of his corporate

> authority, conspired with Defendant Strein for the purpose of interfering with
> Plaintiff Accurso's contractual relations with Roofing Dynamics, Inc. It is further
> contended that Defendant Land (who had no official position with respect to
> Roofing Dynamics Group, LLC) conspired with Defendant Strein for the purpose
> of wrongfully interfering with Plaintiff Accurso's contractual relations with
> Roofing Dynamics Group, LLC—a contractual relationship which Plaintiff had
> with someone other than Defendant Land.

Mem. in Opp. to Mot. for Summ. J. 35-36. The most favorable interpretations of Mr. Accurso's

claims as he has articulated them are that (a) Ms. Strein tortiously interfered with Mr. Accurso's

contract with Roofing Dynamics, Inc., with which she was not associated; and (b) Mr. Land

tortiously interfered with Mr. Accurso's contract with Roofing Dynamics Group, LLC, with

which Mr. Land was not associated.

There is not sufficient evidence on which either theory advanced by Mr. Accurso can

proceed to trial. The Court first notes that, at this stage, "contending" that something happened

will not suffice—there must be evidence, presented to the Court, that what the plaintiff alleged

happened actually happened. No evidence was presented to the Court that Ms. Strein

purposefully interfered with Mr. Accurso's contract with Roofing Dynamics, Inc. First, there is

no evidence that, as Mr. Accurso contends, the *formation* of Roofing Dynamics Group, LLC,

breached Mr. Accurso's contractual rights. *See* Mem. in Opp. to Mot. for Summ. J. 35 (arguing

that Ms. Strein "conspired with Defendant Land to form Roofing Dynamics Group, LLC, for the

purpose of interfering with Plaintiff Accurso's contractual relations with Roofing Dynamics,

Inc."). The only breach of contract that Mr. Accurso has provided evidence of is the termination

of his contract with both entities in 2012—how this breach is related to the *formation* of Roofing

Dynamics Group, LLC, is not articulated, let alone supported by any evidence.

Second, Mr. Accurso has not articulated or provided evidence of how Ms. Strein

purposefully caused Roofing Dynamics, Inc., to terminate Mr. Accurso's contract in 2012. Mr.

Accurso's allegations and evidence focus almost exclusively on Mr. Land's actions in terminating the contract. Absent evidence that Ms. Strein took purposeful action that *caused* harm to Mr. Accurso's contract with Roofing Dynamics, Inc., the Court must grant summary judgment for Ms. Strein on this claim.

Third, Mr. Accurso has not presented evidence to support his theory that Ms. Strein was either (a) not an agent for Roofing Dynamics, Inc., or (b) was otherwise acting outside the scope of her authority as an agent for Roofing Dynamics, Inc. *Cf. Buskirk v. Apollo Metals*, 307 F.3d 160, 172 (3d Cir. 2002) ("Pennsylvania places the burden on the plaintiff, as part of his or her case in chief, to prove the absence of any privilege or justification on the part of the defendant."). Mr. Accurso points to deposition testimony from Mr. Land, in which he describes Ms. Strein's role with Roofing Dynamics, Inc. *See* Mem. in Opp. to Mot. for Summ. J. 16. But Mr. Accurso offers this deposition testimony as proving only that "Defendant Land has acknowledged that Defendant Strein was paid by him out of his share of proceeds from Defendants' businesses." *Id.* It does not necessarily follow that Ms. Strein is not an agent of Roofing Dynamics, Inc. To the contrary, the deposition testimony that Mr. Accurso cites reveals that Ms. Strein worked for, and received company checks from, Roofing Dynamics, Inc. *See, e.g.*, Aug. 5, 2014 Dep. of Brian Land 70:2-16; Dep. of Audrey Strein 63:21-64:3. While Mr. Land did not characterize her as an "employee," he likewise did not characterize Mr. Accurso as an "employee"—a title he appears to have avoided in an effort to avoid the tax consequences of hiring employees. *See infra* Part II.d. Mr. Land testified that Ms. Strein would "make phone calls, solicit, market[ ]" and perform other duties on behalf of Roofing Dynamics, Inc. *See* Aug. 5, 2014 Dep. of Brian Land 69:17-18. By 2011, she was a full-time worker (*i.e.*, agent) for Roofing Dynamics, Inc. *Id.* 68:19-22. Mr. Accurso has not presented any evidence as to whether Ms. Strein's tortious actions (whatever

14

they were) were taken as an agent of Roofing Dynamics, Inc., or any evidence as to how Ms. Strein's tortious actions exceeded the scope of her authority as an agent of Roofing Dynamics, Inc. Because the claim against Ms. Strein for tortious interference with contract is simply one ambiguous allegation atop another, the Court must grant summary judgment in Ms. Strein's favor.

As for the theory that Mr. Land interfered with Mr. Accurso's contractual relationship with Roofing Dynamics Group, LLC, which was solely owned by Ms. Strein, the Court again finds that Mr. Accurso lacks sufficient evidence to survive summary judgment. This theory fails because Mr. Accurso's evidence reveals that Mr. Land, as an agent for Roofing Dynamics Group, LLC, was afforded a qualified privilege from liability for tortious interference with the principal's contract. *See CGB Occupational Therapy*, 357 F.3d at 385 ("The actions of a principal's agent are afforded a qualified privilege from liability for tortious interference with the principal's contract.") Mr. Accurso argues that because Mr. Land testified that he had neither a financial interest nor an official position in Roofing Dynamics Group, LLC, Mr. Land is therefore a third party for purposes of this analysis. Mr. Accurso misunderstands the issue: the point is not whether Mr. Land owned or held an executive position in Roofing Dynamics Group, LLC, but whether he was acting as its agent when he took the action that allegedly intentionally interfered with Mr. Accurso's contractual rights with Roofing Dynamics Group, LLC.

Here, the undisputed evidence is that, at the least, Mr. Land performed work on behalf of Roofing Dynamics Group, LLC, acting as its agent. In his deposition, Mr. Land answered affirmatively to the question about whether he continued to "market roofing services [through Roofing Dynamics Group, LLC] as [he had] done through Infrared Services and Roofing Dynamics, Inc." Aug. 5, 2014 Dep. of Brian Land 91:10-22. He also testified that he "operate[d]

through Group." *Id.* at 90:14-15. Indeed, even Mr. Accurso's Second Amended Complaint alleges that Mr. Land was "a principal member of Defendant Roofing Dynamics Group, LLC." Second Am. Compl. ¶ 10. Therefore, Mr. Land was, at times at least, an agent for Roofing Dynamics Group, LLC.

The question, then, is whether Mr. Land, when he intentionally interfered with Mr. Accurso's contractual relations, did so within the scope of his authority as an agent for Roofing Dynamics Group, LLC, or outside that scope. The Court cannot answer that question, as Mr. Accurso has not articulated what actions by Mr. Land caused the harm to Mr. Accurso's contractual relations with Roofing Dynamics Group, LLC. The Court might speculate that Mr. Land recommended that Ms. Strein terminate Mr. Accurso as an employee of Roofing Dynamics Group, LLC. But even if the Court were to do so, Mr. Accurso would still not have a claim, because the question would remain as to whether Mr. Land had the authority to make such a recommendation.

As the Third Circuit Court of Appeals has explained: "An agent is entitled to act under implicit, as well as express, authority. Implied authority, under Pennsylvania law, is authority to bind the principal to those acts of the agent that are necessary, proper and usual in the exercise of the agent's express authority." *CGB Occupational Therapy*, 357 F.3d at 386 (quotation marks and citations omitted). Mr. Accurso has not presented evidence (or even argument) as to the scope of Mr. Land's authority on behalf of Roofing Dynamics Group, LLC, nor has he presented evidence (or even argument) as to how any specific action by Mr. Land exceeded that scope. To the contrary, the deposition testimony, as well as the several memoranda from Mr. Land to Mr. Accurso, suggest that Mr. Land had, at least, broad implied authority with respect to all of the roofing entities, particularly with respect to Mr. Accurso's employment. *See, e.g.*, Dep. of

16

Audrey Strein 66:10-12 (testifying that she and Mr. Land made a "mutual" decision to have Roofing Dynamics Group, LLC, handle new accounts, and Roofing Dynamics, Inc., handle legacy accounts"); Resp. in Opp. to Mot. for Summ. J. Ex. G at 3 ("to-do" list for Mr. Accurso post-dating the formation of Roofing Dynamics Group, LLC). The "Notice of Immediate Termination" itself purports to come from "Brian Land and Audrey Strein and their several business entities," and instructs Mr. Accurso that "[s]hould any customer or potential customer contact you, you are to refer the customer to Mr. Land with no further comment." Mot. for Summ. J. Ex. E. at 3 (Doc. No. 68-7). Such an instruction implies that Mr. Land had a high level of authority at Roofing Dynamics Group, LLC—authority which included, at least, discussing employment matters with customers and potential customers. Because Mr. Land had broad authority as an agent for Roofing Dynamics Group, LLC, the Court can infer that Mr. Land's implied authority would also have included, at least, recommending that Ms. Strein terminate Mr. Accurso's employment. Mr. Accurso has not presented evidence, or even argument (beyond the level of bald assertion) to the contrary. *Cf. CGB Occupational Therapy*, 357 F.3d at 386 ("CGB could only rebut Sunrise's explicit and implicit authority to terminate by presenting some evidence that Sunrise was acting for an interest adverse to its principal's. CGB did not do so. We must conclude that Sunrise was privileged when it recommended to RHA/Pennsylvania that CGB be terminated.").

Accordingly, the Court will grant Defendants' Motion for Summary Judgment on the tortious interference with contract claim.

**d. Pennsylvania Wage Payment and Collection Law Claim**

Defendants next argue that Mr. Accurso's claim for wages under the Pennsylvania Wage Payment and Collection Law[5] ("WPCL") must fail for two reasons. First, Defendants argue that Mr. Accurso's contract was terminated appropriately and that Mr. Accurso is not owed any funds from after the termination of the contract. This issue turns entirely on the Court's interpretation of the contract. Because the breach of contract claim will survive summary judgment, this claim can likewise proceed.

Second, Defendants argue that Mr. Accurso was not an employee, but rather an independent contractor, and that he therefore is not entitled to the protections of the WPCL. *See Spyridakis v. Riesling Grp., Inc.*, 398 F. App'x 793, 798 (3d Cir. 2010) ("The WPCL applies only to employees, not to independent contractors." (citing *Morin v. Brassington,* 871 A.2d 844, 850 (Pa. Super. Ct. 2005)). "Pennsylvania courts have used a multi-factor test to determine whether an individual is an employee or an independent contractor under the WPCL." *Myers v. Jani-King of Philadelphia, Inc.*, No. 09-1738, 2015 WL 1055700, at *11 (E.D. Pa. Mar. 11, 2015) (citing *Morin*, 871 A.2d at 849-50). As the *Morin* court explained:

> In determining whether a relationship is one of employee-employer or independent contractor, certain factors will be considered which, while not controlling, serve as general guidance to the Court. These factors include: the control of the manner that work is to be done; responsibility for result only; terms of agreement between the parties; the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business; which party supplies the tools; whether payment is by the time or by the job; whether the work is part of the regular business of the employer, and the right to terminate the employment at any time. Paramount for our consideration among these factors is the right of an individual to control the manner that another's work is to be accomplished.

---

[5] The Pennsylvania Wage Payment and Collection Law does not create a substantive right to payment, but merely creates a cause of action to seek wages for which an employee was owed. The term 'wages' includes commissions. 43 Pa. Stat. § 260.2a; *O'Donnell v. Passport Health Commc'ns, Inc.*, No. 11-3231, 2013 WL 1482621, at *9 (E.D. Pa. Apr. 10, 2013).

871 A.2d at 850. "The terms of the agreement between the parties is just one of the criteria . . . [used in] ascertaining whether an employer/employee relationship exists. *Nevin Trucking v. W.C.A.B. (Murdock)*, 667 A.2d 262, 267 (Pa. Commw. Ct. 1995). "Moreover, an agreement of the parties to a designation of their relationship that is contrary to the employer/employee relationship established otherwise is unavailing to effect a change." *Id.* (quotation marks and citation omitted).

        Here, the factors are split. On the one hand, the parties used the term "independent contractor" to describe Mr. Accurso's role, Mr. Accurso was paid on commission, and, as the Court has already concluded, the contract suggests that Mr. Accurso could not be fired without cause at any time but only upon the expiration of his contract. On the other hand, the evidence in the record also shows that Mr. Land exercised significant, detailed control over the manner in which Mr. Accurso completed his work, including rather mundane activities. Memoranda (often titled "to-do lists") from Mr. Land directed Mr. Accurso to, for example, "create format on computer for working accounts," "make photo pages to mount," "anticipate going with me Weds. 16th to Stahl Office Complex," "scheduled Quest meeting—end of following week," "call me with your next day's schedule each day,", and "call both Glen and South County and confirm [appointments]." Resp. in Opp. to Mot. for Summ. J. Ex. A-1 at 11-32. Once, in an effort to "fine tune" Mr. Accurso's "marketing efforts," Mr. Land instructed Mr. Accurso to assemble copies of his call records, EZ pass records, and a list of all the companies he had solicited—notably, this and other instructions were not posed as requests from a client but rather more like commands from an employer. *See id.* at 22-23. Mr. Accurso also avers in an affidavit that he was "required to comply with Defendant Brian Land's instructions about when, where, and how . . . to work and perform services." Affidavit of Peter Accurso ¶ 3. The Court therefore finds that the crucial

factor concerning the extent to which Defendants controlled the manner in which Mr. Accurso completed his work weighs heavily in favor of a finding that Mr. Accurso was an employee.

Further supporting Mr. Accurso's position that he was an employee is the undisputed fact that Mr. Accurso received a substantial amount of his training for his job from Mr. Land. *See id.* ¶ 4 (testifying that he "received all education, training, and instruction from Defendant Brian Land as to the services" he performed); Aug. 5, 2014 Dep. of Brian Land 133:17-19 (testifying that he, Brian Land, got Mr. Accurso "initially started, absolutely" with respect to educating Mr. Accurso in the business). Mr. Accurso also was "required to devote full-time efforts to the business of Defendants" and was not permitted to work elsewhere. *See* Affidavit of Peter Accurso ¶ 10. Mr. Land also "furnished the tools, materials and equipment which were needed [for Mr. Accurso] to perform assessments of the need for construction and/or repair of industrial and commercial flat roofs," although there is also evidence that Mr. Accurso shared in the expenses of the business. *Id.* ¶ 16. Mr. Accurso's tasks were also well within the normal business of the roofing companies for which he worked. *See, e.g.*, Aug. 5, 2014 Dep. of Brian Land 119:2-120:2 (testifying that Mr. Accurso's tasks as a marketer were essentially the same as Mr. Land's and that "[w]e both knew he eventually would find his way up on the roof with me. *It's part of the job*." (emphasis added)); 133:2-6 (responding affirmatively to the question of whether Mr. Accurso "performed work that was part of the regular business that Infrared and Roofing Dynamics, Inc., performed"). In addition to his duties as a marketer for the roofing companies, Mr. Accurso performed clerical tasks on behalf of the companies, such as typing documents for Brian Land. *See* Resp. in Opp. to Mot. for Summ. J. Ex. A-1 at 21 (memo from Brain Land to Peter Accurso which reads, "I have appreciated the fact that you spend long hours with the typing. My rear end and my eyes couldn't take it. And it saves us around $10,000.00 per year

secretarial costs . . . . And, your work's pretty good on the Admin end of things!"). These clerical tasks, which are an inherent part of most any modern business, are more associated with the tasks an employee would perform than those an independent contractor would perform. *See Morin*, 871 A.2d at 850 ("[Relevant factors include] the nature of the work or occupation; the skill required for performance; whether one employed is engaged in a distinct occupation or business . . . ."); Aug. 5, 2014 Dep. of Brian Land 133:11 (describing Mr. Accurso's specialized skills as the ability to "operate a computer").[6]

Upon consideration of all these factors, the Court concludes, as a matter of law, that Mr. Accurso was an employee of Defendants' roofing companies. The factors in favor of concluding that Mr. Accurso was an independent contractor are largely superficial formalities and derive from the initial contract—*e.g.*, the title on the contract and the compensation structure—whereas the factors in favor of concluding that Mr. Accurso was an employee are largely practical and derive from the day-to-day economic realities of the actual working relationship—*e.g.*, the extent to which Defendants controlled the manner in which Mr. Accurso conducted his business, the extent to which Mr. Accurso's tasks were part of the regular business of the roofing companies, and the lack of specialized skill Mr. Accurso brought to the job. *Cf. Verma v. 3001 Castor, Inc.*, No. 13-3034, 2014 WL 2957453, at *10 (E.D. Pa. June 30, 2014) ("Defendant exerts significant control over its dancers' behavior and appearance; Defendant dominates the key levers driving the dancers' opportunity for profit; the dancers have no specialized skills and a limited real investment; and the dancers are integral to the success of the Defendant's club."). Moreover, the formal designation of Mr. Accurso as an "independent contractor" is not determinative, *see*

---

[6] The Court observes that 21st century business activities often have heretofore clerical tasks performed by managers, professionals, and others such as associate lawyers making printer-copies and typing letters, memoranda of law, etc., and doctors making computer input into medical charts.

*Nevin Trucking*, 667 A.2d at 267, nor is his payment on a sales-based commission, *cf. J. G. Leinbach Co. v. Unemployment Comp. Bd. of Review*, 22 A.2d 57, 59 (Pa. Super. Ct. 1941) ("A traveling salesman, who is hired or engaged to go about showing samples, and taking orders for goods which he transmits to his firm, who pass upon the credit of the purchasers and ship or refuse to ship the goods in accordance with their decision and who receive the purchase money when and as paid, is generally regarded as an employee, and it is immaterial, in this respect, whether he is paid a salary or by commission, whether he is furnished transportation by his employer or pays his own expenses, and whether control over the performance of his services is actually exercised, if it has the right to do so for in such case, he is not free from control or direction." (citations omitted)).

The Court concludes that here the realities of the working relationship between the parties outweigh the formalities set forth in the initial contract. *Cf. Safarian v. Am. DG Energy Inc.*, No. 14-2734, 2015 WL 4430837, at *2 (3d Cir. July 21, 2015) (federal law) ("However, it is the economic realities of the relationship . . . not the structure of the relationship, that is determinative. Indeed, the issue arises *because* the parties structured the relationship as an independent contractor, but the caselaw counsels that . . . we must look beyond the structure to the economic realities."); *Bishop v. W.C.A.B. (Walters)*, No. 974 C.D. 2013, 2013 WL 5764569, at *5 (Pa. Commw. Ct. Oct. 23, 2013) ("It is clear from the WCJ's opinion that Decedent's tax returns denoting self-employment did not outweigh the other evidence presented. In light of the numerous findings indicative of an employer-employee relationship, we cannot conclude the WCJ erred." (citation omitted)). Mr. Land had broad powers to control the manner in which Mr. Accurso accomplished his work, as evidenced by the numerous "to-do" lists that show Mr. Land had the authority to manage the minutiae of Mr. Accurso's employment. *See Myers*, 2015 WL

1055700, at *12 ("The key factor is whether the alleged employer possessed the right to control the manner in which the alleged employee's work is performed." (citing *Morin*, 871 A.2d at 850)). Accordingly, the Court finds that Mr. Accurso was an employee of Defendants' roofing companies, and his Pennsylvania Wage Payment and Collection Law claim will survive summary judgment.

### e.  Civil Conspiracy

Finally, Defendants seek summary judgment on Mr. Accurso's civil conspiracy claim. Defendants correctly point out that an underlying *tort* is a predicate for liability for civil conspiracy. *Boyanowski v. Capital Area Intermediate Unit*, 215 F.3d 396, 407 (3d Cir. 2000) ("Since liability for civil conspiracy depends on performance of some underlying tortious act, the conspiracy is not independently actionable; rather, it is a means for establishing vicarious liability for the underlying tort."). Mr. Accurso's claim for civil conspiracy appears to be premised on his tortious interference with contract claim. *See* Mem. in Opp. to Summ. J. 39-40 ("Defendant Land and Defendant Strein together took overt actions pursuant to a common purpose and design to commit a wrongful act—that is, to interfere with contractual relations and improperly divert monies due and owing to another party—and Plaintiff Accurso sustained damages as a result."). Because Mr. Accurso's claim for tortious interference with contract cannot survive summary judgment, neither can his civil conspiracy claim.[7]

---

[7] The Court observes, as it did in its May 28, 2014 Memorandum, that Mr. Accurso likely could not premise his civil conspiracy claims on the alleged violations of the Pennsylvania Wage Payment and Collection Law, or the Employee Polygraph Protection Act, had he sought to do so. As the Court explained: "A civil conspiracy overlay either would seem to flout the purpose of the WPCL as described in the case law by allowing those without 'an active role in decision making' to conspire to do something that they lack corporate power to do, or, alternatively, would seem nugatory by enabling a plaintiff to hold vicariously liable someone who is already directly liable. Much the same might be said about the EPPA . . . ." *See* May 28, 2014 Memorandum 32-33

### III.    CONCLUSION

For the above reasons, the Court will grant the Motion for Summary Judgment as to the tortious interference with contract claims and civil conspiracy claim, and will deny it in all other respects. Any appropriate order follows.

BY THE COURT:

S/Gene E.K. Pratter
GENE E.K. PRATTER
United States District Judge

---

n.23, *available at* 23 F. Supp. 3d 494, 517 n.23. However, the Court does not reach this issue, given that such a claim was neither articulated by Mr. Accurso nor supported by evidence, and neither party briefed the issue.